# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| CHRISTOPHER JENNINGS, individually and on behalf of all others similarly situated | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| KALSHI INC., KALSHIEX LLC, KALSHI KLEAR INC., KALSHI KLEAR LLC, KALSHI TRADING LLC, SUSQUEHANNA INTERNATIONAL GROUP, LLP, AND SUSQUEHANNA GOVERNMENT PRODUCTS, LLP, | |
| Defendants. | |

Plaintiff Christopher Jennings, by and through the undersigned counsel, brings this action against Defendants Kalshi Inc., KalshiEX LLC, Kalshi Klear Inc., Kalshi Klear LLC, Kalshi Trading LLC, Susquehanna International Group, LLP, and Susquehanna Government Products, LLP (together, "Kalshi" or "Defendants") for running an illegal online gambling enterprise in violation of Alabama law, and alleges as follows:

## **INTRODUCTION**

1.    This action seeks declaratory and injunctive relief and damages against Kalshi for evading Alabama gaming laws by offering illegal, unconstitutional, and

untaxed sports betting on its mobile app and website throughout the State of Alabama.

2.    Gambling causes many social and familial harms, including "financial stress, relationship breakdown, family violence, mental illness and suicide."[1] Even more, "[t]he legacy of gambling harm can endure throughout one's life and transmit intergenerationally."[2]

3.    Sports betting in particular is appealing, and in many cases targeted, to minors.[3]

4.    Kalshi is no different, and in fact it permits (and encourages) users under the age of 21 to wager on sporting outcomes.[4]

5.    To protect its residents from these harms, Alabama prohibits gambling-related activities within its borders.

6.    Namely, Alabama's Constitution outlaws it and—more than that—strips the Alabama Legislature of any power to enact a law which would otherwise allow gambling. *See* Ala. Const. art. IV, § 65.

7.    More specifically, Alabama does "not currently allow legal, online sports betting through traditional sports books. That has been a deliberate choice,

---

[1] https://www.who.int/news-room/fact-sheets/detail/gambling

[2] *Id.*

[3] https://www.cbc.ca/news/health/youth-sports-betting-advertisements-enticing-doctors-1.7627752

[4] https://gamblingharm.org/kalshi-college-ambassadors-program/

shaped by our laws, our values, and the voices of Alabama voters."[5]

8.    Kalshi, however, believes it is above Alabama law.

9.    Specifically, Kalshi operates a "prediction market" in Alabama whereby Alabama residents can buy and sell "event contracts" related to, among other things, sporting outcomes all while not registering to do business in Alabama or paying any taxes to the State of Alabama.

10.    And while cleverly disguised as unique securities and/or commodities purportedly regulated by the CFTC, these event contracts are nothing more thinly veiled illegal wagers based on the outcome of specific future events (e.g., whether a sports team will win or lose), as the figures below reflect:



---

[5] https://www.al.com/politics/2026/01/alabama-should-decide-its-own-future-on-sports-betting-op-ed.html



11.    Not only can Alabama residents bet on who will win the game, but Kalshi also provides other traditional sports gambling offerings, such as the outcome of the point spread, total combined points, and prop bets (such as the total number of touchdowns a player may accumulate), as the image below reflects:



12.     Kalshi claims its offerings are legal because they are simply "futures" or "swaps" or "options" intended to hedge financial risks. But Kalshi has admitted there is no sports contracts "serve no commercial purpose at all." And at this point, many courts across the country have rejected Kalshi's word play game.

13.     In fact, many courts have issued injunctions prohibiting the Kalshi from offering sports "contracts" in their states.

14.     Alabama residents, including Plaintiff, regularly gamble large sums of money on Kalshi's platform based on Kalshi's misrepresentation that it is legal in Alabama.

15.     Kalshi has operated in Alabama for years, raking in tens to hundreds of millions of dollars from Alabama residents, including Plaintiff. In fact, Kalshi is estimated to be valued at $5 billion, mostly by offering illegal, unregulated, and untaxed sports betting, including in Alabama.

16.     Through this action, Plaintiff seeks to enforce Alabama's strong, constitutional prohibition against sports gambling by permanently enjoining Kalshi from offering its services in Alabama and seeking damages under Alabama's Loss Recovery Statute.

## JURISDICTION AND VENUE

17.    This Court has diversity jurisdiction under 28 U.S.C. § 1332(d), as the amount in controversy exceeds $5,000,000 and Plaintiff and at least one Class member are citizens of a different state than Defendants.

18.    Venue is proper in this District under 28 U.S.C. § 1391 because Defendants are deemed to reside in any district where they are subject to personal jurisdiction. Plaintiff wagered money or other things of value on Kalshi in this District, and Defendants marketed, advertised, and accepted wagers here. Thus, a substantial portion of the events giving rise to the claims occurred within this District.

19.    The Court also has personal jurisdiction over Defendants because Defendants do substantial business and transactions in Alabama, Plaintiff's claims arise from those Alabama contacts, and it would not offend traditional notions of fair play and substantial justice for Defendants to defend themselves in Alabama.

20.    More specifically, Kalshi operates a highly interactive website within the State of Alabama.

21.    Kalshi.com operates continuously and is designed to generate substantial revenue for Defendants year after year.

22.     Unlike passive websites, Kalshi.com requires users to create accounts, allows users to engage in gambling (including sports betting), and invites users to contact Kalshi directly through the website.

23.     Through this process, Defendants seek to form contracts with Alabama residents, including Plaintiff, and transact with Alabama residents, including Plaintiff.

24.     Kalshi actively advertises and solicits Alabama residents to create accounts and participate in gambling on the Kalshi.com. In fact, Kalshi has paid Al.com to promote Kalshi.com.[6]

25.     Kalshi also uses geo-targeted digital advertisements, banner ads, search-engine optimization efforts aimed at increasing visibility on search engine results pages, and direct email outreach.

26.     Kalshi enables continuous commercial interactions between Alabama residents and Defendants by tracking their geographic location using tools such as GPS, Wi-Fi, wireless network triangulation, transaction location, and IP addresses.

27.     This information is used to "tailor . . . product offerings" and provide each Alabama resident a more "personalized and enhanced user experience."[7]

---

[6] https://www.al.com/betting/kalshi-promo-code/; *see also* Ex. 1.

[7] https://kalshi.com/privacy-policy (last visited Jan. 28, 2026); *see also* Ex. 2.

28.    Kalshi also uses these tracking technologies to measure the effectiveness of its marketing efforts and provide "advertisements based on your interests and activities on [Kalshi.]"[8]

29.    These activities and advertisements serve one purpose: to reach into Alabama and encourage Alabama residents to register accounts and engage in online gambling activities for Defendants' profit.

30.    Once Alabama residents complete the registration process, Kalshi contacts Alabama residents directly to, among other things, answer questions or comments, deliver newsletters, make suggestions and recommendations based on your captures data, and respond to users who have contacted Kalshi regarding employment opportunities.

31.    Importantly, Kalshi will also directly contact users who owe money on the website.[9] This active collection places Kalshi in the position of initiating financial contact within the state rather than merely operating a passive online platform. Kalshi's conduct is akin to how a traditional bookmaker pursues bettors to collect winnings or settle accounts. Accordingly, Kalshi's conduct moves it contacts with Alabama beyond passive facilitation and into a realm of purposeful, targeted financial interaction with Alabama residents.

---

[8] *Id.*

[9] *Id.*

32.     Kalshi also knowingly accepts payments from Alabama bank accounts and debit/credit cards to place wagers on the Kalshi.com.

33.     Kalshi operates for the benefit of all Defendants, who are affiliated and together operate solely to derive substantial revenue from their continuous and systematic contacts with Alabama and transactions with Alabama residents.

34.     Kalshi also obtains user information from third parties, like Google and Facebook to track users' "to tailor [Kalshi's] advertisements and content to you."[10]

35.     Kalshi also operates as a market maker, where it will transact and attempt to contract with Alabama residents on certain sporting events, profiting from those purported contracts and transactions.

36.     Not only did Defendant Susquehanna benefit from Kalshi's substantial contacts with Alabama, but it, acting as a market maker, attempted contract directly with Alabama residents on certain wagers, and profited from those purported contracts and transactions.

37.     Throughout the relevant time period, Defendants systematically conducted and continue to conduct business in Alabama.

38.     It was foreseeable, and intended, that Alabama residents would use Kalshi.com, as Defendants were well aware that Alabama customers regularly participated in online gambling through the website.

---

[10] *Id.*

39.     Defendants profit substantially from Alabama users, who make up a significant portion of their customer base.

40.     Defendants reached into Alabama, advertised in Alabama, invited Alabama residents to participate in gambling on Kalshi.com, and transacted with Alabama residents. By doing so, Defendants purposefully availed themselves of the privilege of conducting business in Alabama.

## PARTIES

**Plaintiff**

41.     Plaintiff Christopher Jennings is an Alabama citizen and resident of Millbrook, Alabama. Plaintiff created a Kalshi account in Alabama using his Alabama address and bank account. Plaintiff has placed sports wagers on Kalshi in Alabama.

**Defendants**

42.     **Defendant Kalshi Inc.** is a Delaware corporation headquartered at 594 Broadway Rm 407, New York City, New York 10012. On information and belief, it is the parent company of all other Kalshi entities and operates a prediction market whereby Alabama residents can place illegal wagers on the outcome of sporting events.

43.     **Defendant KalshiEX LLC** is a Delaware corporation headquartered at 594 Broadway Rm 407, New York City, New York 10012. On information and

belief, it is a wholly owned subsidiary of Kalshi Inc. that operates a commodities exchange and prediction market whereby Alabama residents can place illegal wagers on the outcome of sporting events.

44.    **Defendant Kalshi Klear Inc.** is a Delaware corporation headquartered at 594 Broadway Rm 407, New York City, New York 10012. On information and belief, it is a wholly owned subsidiary of Kalshi Inc. that operates a registered derivatives clearing organization and prediction market whereby Alabama residents can place illegal wagers on the outcome of sporting events.

45.    **Defendant Kalshi Klear LLC** is a Delaware corporation headquartered at 594 Broadway Rm 407, New York City, New York 10012. On information and belief, it is a wholly owned subsidiary of Kalshi Inc. that operates a registered derivatives clearing organization and prediction market whereby Alabama residents can place illegal wagers on the outcome of sporting events.

46.    **Defendant Kalshi Trading LLC** is a Delaware corporation headquartered at 594 Broadway Rm 407, New York City, New York 10012. On information and belief, it is a wholly owned subsidiary of Kalshi Inc. that operates as a market maker for Kalshi's prediction market (creating, buying, and selling event contracts on the platform) whereby Alabama residents can place illegal wagers on the outcome of sporting events. It undertakes "bookmaking" in violation of Ala. Code § 13A-12-20, *et seq.*

47.    **Defendant Susquehanna International Group LLP** is a Delaware corporation headquartered at 401 City Avenue Suite 220, Bala Cynwyd, Pennsylvania 19004. On information and belief, it is the parent company of all Susquehanna entities. As relevant, Susquehanna serves as a market maker for Kalshi, creating, buying, and selling event contracts on the platform. It undertakes "bookmaking" in violation of Ala. Code § 13A-12-20, *et seq.*

48.    **Defendant Susquehanna Government Products, LLP** is a foreign limited partnership incorporated in Delaware and headquartered at 80 State Street, Albany, New York 12207. On information and belief, it is a wholly owned subsidiary of Susquehanna International Group LLP. As relevant, Susquehanna serves as a market maker for Kalshi, creating, buying, and selling event contracts on the platform. It undertakes "bookmaking" in violation of Ala. Code § 13A-12-20, *et seq.*

## FACTUAL ALLEGATIONS

### I.    Prediction Markets – How They Work

49.    Prediction markets allow people to bet on the outcome of future events, such as sports, elections or weather, through online platforms.[11]

50.    According to Kalshi:

The NYSE and Kalshi both deal in markets, but with a key difference: what's being traded. The NYSE is a traditional stock exchange where

---

[11] https://wifpr.wharton.upenn.edu/blog/a-primer-on-prediction-markets/

you buy and sell shares of ownership in companies. Kalshi, on the other hand, is a prediction market. Here, you trade contracts based on whether specific events will happen, like "Will interest rates rise in the next quarter?" Think of it like predicting the future, with the price of the contracts reflecting the collective prediction of the market participants.[12]

51.    Kalshi admits it is an "exchange where you can buy and sell contracts on the outcome of events."[13]

52.    In fact, Kalshi even admits it is chance based – the hallmark of illegal gambling.[14]

53.    To participate, users must be 18 years or older and create an account by providing "basic personal information" such as name, age, and address, and in many cases submit documents verifying the personal information presented.[15]

54.    When creating an account, there are no terms or conditions linked below the registration process.

55.    After an account is created, users must then fund their account with either debit or credit card deposits, bank deposits, crypto deposits, or direct wire deposits.[16]

---

[12] https://help.kalshi.com/kalshi-101/what-are-prediction-markets; *see also* Ex. 3.

[13] https://help.kalshi.com/kalshi-101/what-are-prediction-markets

[14] *Id*

[15] https://help.kalshi.com/account/signing-up/signing-up-as-an-individual; *see also* Ex. 4.

[16] https://help.kalshi.com/transfer-funds/deposit-funds; *see also* Ex. 5.

56.    After a user creates and funds an account, they are free to start betting on the outcome of many events, from sports to politics to pop culture.

57.    Most wagers are priced between 1 cent and $1, and bettors take a "yes" or "no" position. When the outcome of the event is verified, the contract pays out whoever guessed correctly.

58.    Once the winners are determined, they receive a cash payout that can be transferred to their bank accounts or crypto wallets, among other things.[17]

## II.    Defendants Operate as Bookmakers, Providing Vital Liquidity on Kalshi

59.    Like any gambling enterprise, for Kalshi to offer event contracts successfully, it needs sufficient liquidity.

60.    To obtain that liquidity, Kalshi uses market makers, such as Defendants Kalshi Trading LLC, Susquehanna International Group, LLP, and Susquehanna Government Products, LLP. As explained in more detail below, these market makers operate like traditional bookmakers (or "bookies").

61.    Market Makers set probabilities for future events on Kalshi by buying what they consider to be undervalued event contracts and selling event contracts that they consider to be overvalued.

62.    By performing these actions, the event contract prices are brought to an equilibrium reflecting all publicly available information. This process ensures that

_____

[17] https://help.kalshi.com/transfer-funds/withdraw-funds; *see also* Ex. 6.

there is enough price movement to set the "Yes" and "No" options for wagers exactly equal to $1.00, which is a requirement for transacting over event contracts on Kalshi.

63.    Kalshi's own website admits that market makers play a vital role in propping up its prediction market.

64.    As an illustration, a market maker on Kalshi is like a carnival booth worker who always stands ready to buy or sell tickets for a game predicting whether an event will happen. Even if no one else is in line, the worker will still take your trade, ensuring you can buy a YES ticket or sell a NO ticket instantly. By constantly offering both sides, the worker keeps the game flowing smoothly, preventing stalls when the crowd is imbalanced.

65.    Market makers on Kalshi operate much like the booth worker: they stand ready to buy and sell so that other participants can always find a counterparty. By continuously providing both "Yes" and "No" contracts, they keep the market liquid and prices moving smoothly. In some cases, the pricing of those contracts allows a market maker to take opposite positions that cancel out any risk, essentially guaranteeing a small profit no matter how the event turns out. This type of arrangement represents what a recent letter to the CFTC described as a "riskless principal transaction."

66.    To obtain additional profits, market makers will choose to favor one side of the ledger, providing liquidity to the market but taking on a balance-sheet

risk. Should the market maker wager incorrectly, it risks losing its money. To minimize this risk, market makers employ dedicated research teams, proprietary statistical models, and superior data and software. These tools allow them to estimate future events with greater accuracy than any individual gambler on Kalshi could hope for.

67.    Additionally, market makers gain advantages through their distinct contractual arrangements and technological integration with prediction markets. These advantages include "financial benefits, recued fees, differing positions limits, and enhances access." These advantages greatly reduce market makers' financial exposure. As a result, wagering against individual gamblers is almost all upside for them.

68.    Between these two sorts of wagers, Market makers capture nearly all potential arbitrage opportunities on Kalshi and similar prediction markets. As a result, it is nearly impossible for individual gamblers to achieve profits from gambling on Kalshi, even before considering Kalshi's alleged "transaction fees."

69.    Empirical research supports this conclusion; studies indicate that only approximately 3% of sports betters earn annual profits, while the remaining 97% experience losses.

70.     Moreover, much of the apparent success among profitable gamblers can be attributed to survivorship bias, the statistical inevitability that some individuals will occasionally win given sufficient time.

71.     Similar findings have been reported for betting on other uncertain future events, including music, pop culture, and world affairs. Kalshi acknowledges these results; for example, its founder and CEO, Tarek Monsour, has noted that "Kalshi is already the most accurate forecast for federal interest rates."

72.     In all relevant aspects, the market makers here operate just like traditional sportsbooks. And that is unsurprising. Traditional sportsbooks are a type of market maker, one that is focused only on event contact for sports-related events.

73.     Just like traditional sportsbooks, event-contract market makers can secure risk-free profits by arbitraging the "bid-ask spread," by capitalizing on the gap between buying prices and selling prices of certain wages.

74.     Additionally, just like traditional sportsbooks, market makers are large institutional investors with large teams, sophisticated models, and extensive resources, and enjoy privileged status as a result of their contractual and technological integration with the platform itself.

75.     Furthermore, just as with traditional sportsbooks, event-contract market makers will sometimes risk their own capital by committing it to one side of the

ledger, putting them in direct competition with individual gamblers. In other words, the market maker is either a winner or loser of the wager.

76.    It doesn't matter that wagers on Kalshi usually offer percentages, rather than traditional betting lines. This is simply a distinction without a difference.

77.    For example, if the Alabama Crimson Tide football team was listed as a -400 favorite to win the Iron Bowl, they would also be listed as 80% favorites to win on prediction markets like Kalshi. These two figures are simply different mathematical ways of expressing the same probability. Indeed, one leading sports-betting website encourages gamblers to convert sportsbooks' betting lines into probabilities (like the ones Kalshi uses) to assist them in calculating expected value.

78.    According to information published on Kalshi's own website, market makers account for the overwhelming majority of total spending on Kalshi event contracts. This means that when Alabama residents place a bet on Kalshi, they are almost always matched against a market maker.

79.    Therefore, even though Kalshi technically serves as the direct counterparty for every trade on its platform (and thus is seen as a "winner" of the bettors' money), market makers also act as counterparties, regardless of whether they are exposed to balance-sheet risk. Since individual bettors cannot compete with the expertise, advanced analytics, and resources that market makers possess, they are at a disadvantage and lose expected value with each event contract they purchase.

80. Prediction markets and market makers are not always separate entities. KalshiEX's rulebook acknowledges that Kalshi Trading LLC may be a member of the prediction market, meaning that it is able to place trades on individual wagers, thereby placing bets directly with Alabama residents.

81. A recent article confirms that "Kalshi is also doing some of its own market making through a separate entity called Kalshi Trading." In other words, Kalshi does not merely own and operate a prediction platform, it also participates in the gambling transactions as a better, thereby driving gambling on the platform.

82. In this way, Kalshi pits itself directly against individual users, including Alabama residents. This is just one aspect in which Kalshi qualifies itself as a gambling "winner."

83. Another way Kalshi qualifies itself as a gambling "winner" is by actively reaching out to users who owe money on its platform to collect.[18] This conduct positions Kalshi itself as a clear winner in the context of gambling, much like a traditional bookmaker. Rather than simply operating as a passive online service, Kalshi's proactive approach to collecting debts mirrors the conduct of bookmakers who pursue bettors to settle accounts or claim winnings.

---

[18] https://kalshi.com/privacy-policy (last visited Jan. 28, 2026).

84.     However, to provide further liquidity, Kalshi also partners with certain hand-select third-party market makers. The most notable of these is Susquehanna, which in April 2024 became the first external institutional market maker on Kalshi.

85.     Despite being separate legal entities, market makers like Susquehanna are not financially independent of Kalshi. Rather, they are Kalshi's business partners, contracting directly with Kalshi to provide liquidity to its prediction market. In exchange, they receive numerous financial and non-financial kickbacks. In this respect, all Defendants are working in concert to make illegal, unconstitutional, and unregulated gambling available within the State of Alabama.

86.     Kalshi confirms this relationship with market makers on its website when it acknowledges that "applicants undergo a thorough review process evaluating their financial resources, relevant experience, and overall business reputation," and "[o]nly those demonstrating exceptional qualifications are granted market maker status."

87.     Kalshi further acknowledges that, as a reward for operating as a market maker on Kalshi, market makers receive benefits from Kalshi, "including but not limited to financial benefits, reduced fees, differing position limits, and enhanced access," none of which is available to the general public.

88.     As a result of this symbiotic relationship, marker makers are left with a decided advantage when using Kalshi's platform, ensuring that they profit at the

expense of others, while Kalshi's platform continues to possess the necessary liquidity to operate.

89. Based upon the investigation made by the undersigned attorneys, Alabama residents have repeatedly placed illegal, unconstitutional, and unregulated event contracts supported by liquidity provided by institutional market makers, including Kalshi Trading LLC and Susquehanna.

90. Because the Alabama residents' funds flowed to these market makers, they are "winners" for purposes of the Ala. Code §§ 8-1-150, *et seq.*

## III.    Defendants' Conduct is Illegal in Alabama

91. It is illegal to offer unlicensed gambling, especially sports gambling, in Alabama.

92. And the CFTC does not override Alabama law, as the Commodities Exchange Act prohibits the CFTC from permitting "contracts" that are "contrary to the public interest" such as contracts based on "gaming." *See* 17 CFR § 40.11.

93. Though the CFTC has not defined gaming (if the Court is even bound by the CFTC's definition), Kalshi has.

94. For example, Kalshi once admitted to the D.C. Circuit that "[t]he classic example is a contract on the outcome of a sporting event; as the legislative history directly confirms, Congress did not want sports betting to be conducted on derivatives markets," like those provided by Kalshi. KALSHIEX LLC, Plaintiff-

Appellee, v. COMMODITY FUTURES TRADING COMMISSION, Defendant-Appellant., 2024 WL 4802698, at *41.

95.    Kalshi further admitted that "[e]vidently, Congress sought to prevent exchanges [like Kalshi] from facilitating casino-style or sports gambling. On a policy level, that makes some sense: The basic purpose of Designated Contract Markets is to allow 'hedging' of economic risk." *Id*. at *45.

96.    Kalshi even admitted that "the word 'gaming' on its face--and in accord with its legislative history--is concerned with casino gambling and sports . . .." *Id*. at *50.

97.    Kalshi has also admitted that, among other things, there are "[t]hree examples of gaming contracts: Football, horseracing, golf. They're all games. It's something that has no inherent economic significance. It's something done for amusement. It may be done purely to facilitate the betting itself for its own sake," and even "[t]he 'gaming' category reaches contracts contingent on games—for example, whether a certain team will win the Super Bowl. It thus functions as a check on attempts to launder sports gambling through the derivatives markets."[19]

98.    Naturally, one may question what this lawsuit is all about considering these clear, unequivocal admissions.

---

[19] https://www.linkedin.com/posts/daniel-wallach-a959a77_kalshis-prior-judicial-admissions-both-activity-7338273722673295360-53XG/

99.    Well, Kalshi pivoted. Kalshi now ignores its prior inconsistent statements and boldly claims it:

> is regulated by the Commodity Futures Trading Commission (CFTC) – an independent agency of the US government that has regulated US derivatives markets since 1974 and is overseen by Congress. Kalshi is regulated as a Designated Contract Market (DCM), which is a financial exchange designated to trade futures, swaps, and/or options on commodities.

100.    But this Court need not turn a blind eye to Kalshi's past statements.

101.    Nor does the CFTC preempt Alabama's constitutional prohibition against gambling.

102.    Authorities suggest that the CFTC preempts events based on occurrences, not outcomes.

103.    But as several courts have held, Kalshi's "contracts" outcomes because it "self-certified to the CFTC [that] these contracts turn on the outcome of the live event, not on the 'occurrence, nonoccurrence, or the extent of the occurrence' of a live event.'" *See North American Derivatives Exchange, Inc., v. The State of Nevada, et al.*, 25-cv-00978-APG-BNW, Dkt. 105 (D. Nev.).

104.    Under this framework, this case can be resolved with judicially noticeable statements. On the one hand, Kalshi admitted that event contracts under the CFTC do not – and cannot – cover sporting events. *See* ¶¶ 94-99, *supra*. And on the other, Kalshi admits, very frequently, that its sports event "contracts" are based on the outcome of the event. *See infra*.

105.   For example, when explaining how its website works, Kalshi admits it "is the first regulated exchange where you can buy and sell contracts on the outcome of events."[20]

106.   When discussing the rules, Kalshi admitted each event contract has its own "rules summary available that provides clarity by detailing the specific outcomes required for a strike to be successful. It elaborates on the conditions under which an outcome would meet the necessary criteria for a strike to win."[21]

107.   And Kalshi admits that it relies on outside sources "for determining outcomes."[22]

108.   Moreover, when it self-certified its "Football Stats" contract with the CFTC, for example, it certified that "The Payout Criterion for the Contract encompasses the Expiration Values where <outcomes> occur in the specified <events>."[23]

109.   Another self-certification example for the outcome of NCAA Football games shows that payouts are "based on the outcome of a recurrent event."[24]

---

[20] https://help.kalshi.com/kalshi-101/what-are-prediction-markets

[21] https://help.kalshi.com/markets/markets-101/market-rules; Ex. 7.

[22] https://help.kalshi.com/markets/markets-101/market-rules/rules-summary

[23] https://www.cftc.gov/sites/default/files/filings/ptc/25/09/ptc09022529868.pdf; *see also* Ex. 8.

[24] https://kalshi-public-docs.s3.amazonaws.com/contract_terms/NCAAFGAME.pdf

110.    On its website, it claims its event "contracts let people trade directly on sports, politics, economics, weather, AI, and other **outcomes** that shape their lives" and it lets "you trade on real-world **outcomes** that matter to you using simple yes-or-no questions."[25]

111.    While trying to build trust in its platform, Kalshi admitted it "operates as a neutral exchange platform, emphasizing its impartiality in event outcomes."[26]

112.    To resolve all doubt (if there was ever any), until recently, Kalshi notoriously advertised itself on social media as "The First Nationwide Legal Sports Betting Platform"[27]



---

[25] https://kalshi.com/careers (emphasis added); *see also* Ex. 9.

[26] https://help.kalshi.com/kalshi-101/how-does-kalshi-make-money; *see also* Ex. 10.

[27] https://closingline.substack.com/p/the-takeaway-nothing-is-gambling

113.   Though Kalshi recently changed its messaging, it never changed its business model, self-certifications, or the way it operates, therefore conceding it offers sports betting services, which is illegal in Alabama.

114.   The Alabama Attorney General agrees that Kalshi's sports offerings are illegal and has signed onto amicus briefs advocating such.[28]

## IV.   <u>Defendants Cause Injury in Alabama</u>

115.    Kalshi has become one of the largest gambling platforms in the United States. Within the first five months of offering sports contracts, it traded "more than $1 billion" on "3.4 million sports propositions."

116.   Kalshi also claims to have over two million users nationwide, with many users in Alabama.

117.   Kalshi prominently advertises that it operates in all 50 states, including Alabama.

118.   Many Alabama citizens have enrolled, participated, and wagered money or other things of value on sporting events on Kalshi. A great many of them are high school or college students or young adults.

119.   Kalshi Trading LLC and/or Susquehanna served as the market makers for most, if not all, of those sporting event contracts, buying and selling sports contracts in Alabama against Alabama residents.

---

[28] https://closingline.substack.com/p/the-current-everyone-joins-the-case

## V.    Kalshi Preys on Young and Vulnerable Alabama Citizens

120.    Kalshi is fueling a pandemic of online gambling addiction. As one recent article noted, prediction markets like Kalshi "blur the already hazy line between betting and other financial activities," as "the ability to place one bet after another" on those platforms "encourages a hallmark behavior of problem gamblers – when deep in the red, instead of walking away, they bet bigger."

121.    A study from the University of California San Diego found sports betting affects lower-income consumers, who spend as much as 10% of their income on gambling.[29]

122.    That same study found that 96% of gamblers lose money gambling, whereas only 4% made money from online betting.

123.    Problem gambling is especially common among young sports betters, who Kalshi targets. Per one study, some 58% of 18- to 22-year-olds gamble on sports each year, with roughly 10% gambling on sports each week and 4% doing so daily, including Alabama citizens.

124.    Sports gambling addictions can begin as early as age 10, and studies have found that between 4% and 8% suffer from problem gambling – including Alabama citizens.

---

[29] https://today.ucsd.edu/story/legalized-gambling-increases-irresponsible-betting-behavior-especially-among-low-income-populations

125.   These addictions can prove financially ruinous. And the habit takes a severe emotional toll, as, of the gamblers who actually sought treatment, "between 22 and 81 percent . . . have been found to have suicidal ideations," and "between 7 and 30 percent of individuals have had suicide attempts."

126.   Kalshi targets young adults and minors in its advertising, including enlisting an army of "Ambassadors" on college campuses to help promote its website.[30]

127.   Kalshi also partners with popular social media accounts to promote its products. Young adults and minors are the primary audience for these social media accounts.

## CLASS ACTION ALLEGATIONS

128.   Plaintiff brings this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of himself and all others similarly situated.

129.   Plaintiff seeks to represent the following Alabama Class:

All Alabama residents who have paid money or other things of value by taking a position on one or more sporting events on Kalshi.

130.   Excluded from the Class are Defendants and any of their members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns;

---

[30] https://gamblingharm.org/kalshi-college-ambassadors-program/

the judicial officers, and their immediate family members; and Court staff assigned to this case. Plaintiff reserves the right to modify or amend the Class definition, as appropriate, during the course of this litigation.

131. This action has been brought and may properly be maintained on behalf of the Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

132. **Numerosity – Federal Rule of Civil Procedure 23(a)(1)**. The members of the Class are so numerous and geographically dispersed that individual joinder of all class members is impracticable. While Plaintiff is informed and believes that there are hundreds to thousands of members of the Class, the precise number of Class Members is unknown to Plaintiff but may be ascertained from Defendant's books and records. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

133. **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**. This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

    a.    Whether Defendants engaged in the conduct alleged herein;

    b.    Whether Defendants' alleged conduct violates applicable law;

c.    Whether services on Kalshi.com are illegal gambling in Alabama;

d.    Whether Plaintiff and Class members wagered money or other things value on Kalshi.com in Alabama;

e.    The amount of money or other things of value wagered by Plaintiff and Class members in Alabama;

f.    Whether Defendants engaged in unconscionable, false, misleading, or deceptive acts or practices in the conduct of trade or commerce in Alabama;

g.    Whether Defendants' unconscionable, false, misleading, or deceptive acts or practices in the conduct of trade or commerce in Alabama were likely to deceive Class members;

h.    Whether Class members are entitled to damages, restitution, restitutionary disgorgement, equitable relief, statutory damages, exemplary damages, and/or other relief; and

i.    The amount and nature of relief to be awarded to Plaintiff and the other Class members.

134.    **Typicality – Federal Rule of Civil Procedure 23(a)(3).**  Plaintiff's claims are typical of the other Class members' claims because Plaintiff and the Class members paid money or other things of value on Kalshi.com in Alabama. Also, neither Plaintiff nor the other Class Members would have participated on Kalshi.com

had Defendants not engaged in unconscionable, false, misleading, or deceptive acts or practices in the conduct of trade or commerce. Plaintiff and the other Class members suffered damages as a direct proximate result of the same wrongful practices in which Defendant engaged. Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the other Class members.

135.    **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).**  Plaintiff is an adequate Class representative because his interests do not conflict with the interests of the other members of the Class that he seeks to represent, Plaintiff retained counsel competent and experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously. The Class's interests will be fairly and adequately protected by Plaintiff and her counsel.

136.    **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).**  Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class members as a whole.

137.    **Superiority – Federal Rule of Civil Procedure 23(b)(3).**  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the

management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims, so it would be impracticable for the Class members to individually seek redress. Even if the Class members could afford litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

138.  **Ascertainability –** Kalshi maintains a robust database with all its participants. Each participant must create an account to participate and must select and verify which state they are from. Kalshi also assigns each participant's account an individually identifiable number.

### CAUSES OF ACTION

### COUNT ONE
**Declaratory Judgment**
**28 U.S.C. §§ 2201 *et seq*.**

139.  Plaintiff realleges and incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

140.   Plaintiff brings this count individually and on behalf of all other Class members.

141.   Alabama law strongly prohibits sports betting.

142.   Yet, Kalshi offers sports gambling in Alabama.

143.   Kalshi engages in bookmaking in violation of Ala. Code § 13A-12-20, *et seq.*

144.   Kalshi allows users to bet on the outcome of sporting events. The bets accepted are wagers under Alabama law.

145.   The sporting events are games of chance under Alabama law.

146.   Kalshi offers cash prizes for winning the games of chance.

147.   Plaintiff and Class members paid money or other things of value to Kalshi on sporting events.

148.   Plaintiff and Class members seek (1) an order declaring that Kalshi's sporting event offerings are illegal in Alabama and (2) a permanent injunction enjoining Kalshi from offering it sport event contracts in Alabama, with disgorgement of profits.

149.   Plaintiff and Class members demand a speedy declaratory judgment hearing pursuant to Fed. R. Civ. P. 57.

## <u>COUNT TWO</u>
### ALABAMA GAMBLING LOSS RECOVERY STATUTE
### Ala. Code §§ 8-1-150, *et seq.*

150.   Plaintiff realleges and incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

151.   Plaintiff brings this count individually and on behalf of all other Class members.

152.   Plaintiff is similarly situated as other Class members, as each are Alabama residents who have paid money or other things of value on Kalshi, or are the spouse, child, or next of kin of an Alabama resident who paid money or other things of value on Kalshi.

153.   Kalshi operates an illegal gambling website that is accessible in Alabama.

154.   Plaintiff and other Class members paid money or other things of value on Kalshi wagering on sporting events.

155.   Plaintiff and other Class members demand recovery of the money or other things of value wagered on Kalshi on sporting events in an amount to be determined at trial, including interest.

156.   Plaintiff also seeks recovery of money or other things paid and lost on Kalshi on behalf of the spouses, children, and next of kin of the losers.

157.   Plaintiff and Class members also seek an order declaring that (1) Kalshi is illegal gambling in Alabama and (2) any authority under which it purports to

operate is unconstitutional, as well as a permanent injunction enjoining Kalshi from operating in Alabama, with disgorgement of profits.

## COUNT THREE
### VIOLATIONS OF ALABAMA'S DECEPTIVE TRADE PRACTICES ACT
### Ala. Code §§ 8-19-1, *et seq.*

158.   Plaintiff realleges and incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

159.   Plaintiff brings this count individually and on behalf of all other Class members.

160.   Defendants, Plaintiff, and Class members are "persons" within the meaning of Ala. Code § 8-19-3.

161.   Plaintiff and the Class members are "consumers" within the meaning of Ala. Code § 8-19-3.

162.   Defendants offered "goods" and/or "services" within the meaning of Ala. Code § 8-19-3.

163.   Defendants are engaged in "trade" or "commerce" within the meaning of Ala. Code. § 8-19-3.

164.    The Alabama Deceptive Trade Practices Act (ADTPA), Ala. Code. § 8-19-5, prohibits "[e]ngaging in . . . unconscionable, false, or deceptive act[s] or practice[s] in business, commerce, or trade."

165.    The ADTPA provides a non-exhaustive list of unconscionable, false, or deceptive acts or business practices, including but not limited to:

a.    Causing confusion or misunderstanding of approval of good or services;

b.    Causing confusion or misunderstanding as to the certification of another of goods or services;

c.    Representing that goods or services are of a particular standard if they are not; and

d.    Engaging in any other unconscionable, false, misleading, or deceptive act or practice.

166.    Defendants violated the ADTPA by misrepresenting or causing confusion or misunderstanding that sports gambling on Kalshi is legal and approved or certified by the State, when in fact it is illegal gambling in Alabama.

167.    Defendants further violated the ADTPA by representing that the goods or services are of a particular standard and legal in Alabama, when in fact gambling is illegal in Alabama.

168.    Defendants further violated the ADTPA by representing, implying, and/or failing to disclose that its goods or services are illegal in Alabama, which is an unconscionable, false, misleading, and/or deceptive act and/or business practice.

169.    Other unconscionable, false, misleading, and/or deceptive act and/or business practice employed by Defendants include:

a.    deceiving or confusing customers into believing that the gambling transactions confer or involve certain rights, remedies, or obligations (i.e., the right to recover winnings and the obligation to pay for losses), when in fact any such rights, remedies, or obligations are prohibited by law; and

b.    representing that the website users will receive an economic benefit (in the form of gambling winnings), when the earning of the benefit is contingent on an event to occur subsequent to the consummation of the transaction (i.e., winning the bet).

170.    To the extent required by law, Defendants owed a duty to Plaintiffs and the Class because disclosure that participation on its website is illegal was necessary to dispel misleading impressions that participation on Defendants' website was legal.

171.    Defendants' unfair or deceptive acts or practices were likely to, and did, in fact, deceive Plaintiff and Class members about the true approval, certification, and legality of its goods or services.

172.   Defendants' violations present a continuing risk to Plaintiffs and the Class members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

173.   Defendants acted with knowledge and intent to deceive.

174.   Plaintiff and Class members suffered ascertainable losses and actual damages as a direct result of Defendant's conduct. Plaintiff and other Class members would not have participated on Kalshi had Defendant disclosed the true nature of Kalshi.

175.   Pursuant to Ala. Code § 8-19-10, Plaintiff and the Class members seek an order enjoining Defendants' unfair and/or deceptive acts or practices and awarding damages, treble damages, and any other just and proper relief available under the ADTPA.

176.   Notice is not required since Defendant does not maintain a place of business or does not keep assets within Alabama.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the Class, prays for judgement against Defendants and respectfully requests the Court grant the following relief:

A. Certifying the Class, appointing Plaintiff as Class representative, and appointing the undersigned counsel as Class Counsel;

B. Declaring that Defendants' actions are illegal in Alabama;

C. Enjoining Defendants from operating or offering services in Alabama;

D. Awarding damages, including bets lost on sports events in Alabama and punitive damages;

E. Awarding costs, including reasonable attorneys' fees, expert fees, and litigation costs; and

F. Awarding pre- and post-judgment interest;

G. Awarding any other such relief allowed by law the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all issues so triable.

Dated: January 29, 2026                Respectfully Submitted,

By: *J. Mitchell Williams*

J. Mitchell Williams [ABS 8560X19D]
W. Daniel "Dee" Miles [ASB-7656-M75W]
Dylan T. Martin [ASB-2336B15S]
Trenton H. Mann [ASB-5716Z690]
BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.
272 Commerce Street
Montgomery, Alabama 36104
T: (334) 269-2343  F: (334) 954-7555
dee.miles@beasleyallen.com
mitch.williams@beasleyallen.com
dylan.martin@beasleyallen.com
Trent.mann@beasleyallen.com

Joel D. Smith*
Yeremey O. Krivoshey*
SMITH KRIVOSHEY, PC
166 Geary Str STE 1500-1507
San Francisco, CA 94108
T: 415-839-7077 /F:(888)410-0415
joel@skclassactions.com
yeremey@skclassactions.com

Jonathan D. Wynn, III [ASB-3044M52I]
THE CLEVELAND FIRM, LLC
707 McQueen Smith Road S.
Prattville, Alabama 36066
(334)365-6266 / (334)365-6818 Fax
Jonathan@clevelandgroup.legal

*Attorneys for Plaintiff and the Class*

*\* pro hac vice forthcoming*